577 A.2d 99

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
JACINTO K. HIGHTOWER, DEFENDANT-APPELLANT.

Argued September 26, 1989—Decided July 12, 1990.

382

384 

*Philip A. Ross* and *Paul H. Feinberg,* Designated Counsel, argued the cause for appellant (*Alfred A. Slocum,* Public Defender, attorney).

*Meredith A. Coté,* Deputy Attorney General, argued the cause for respondent (*Peter N. Perretti, Jr.,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

CLIFFORD, J.

A jury convicted defendant, Jacinto K. Hightower, for the murder of Cynthia Barlieb and for several offenses related to the murder. Following the penalty phase, the trial court sentenced defendant to death. He appeals directly to this Court as of right, *R.* 2:2–1(a)(3), from the murder conviction and death sentence. We affirm his conviction for murder. The Attorney General concedes that defendant's death sentence must be vacated because the trial court's charge requiring juror unanimity on a mitigating factor violated the principles subsequently enunciated in *State v. Bey,* 112 *N.J.* 123, 159–60, 548 *A.*2d 887 (1988) (*Bey* II). We therefore set aside the death sentence and remand the matter for a new sentencing proceeding.

I

–A–

At 5:30 a.m. on Sunday, July 7, 1985, Cynthia Barlieb drove her gray 1982 Dodge Omni to the Cumberland Farms on Pennypacker Drive in Willingboro, where she worked as a clerk. She received a call around noon from her husband, who noticed nothing unusual about her voice.

At 12:15 p.m. Donald Morris, an off-duty police officer, stopped at the convenience store to buy chewing tobacco. Morris observed a black male standing at the cash register talking to the clerk behind the counter. The man was about five feet ten inches tall, thin, and light-complexioned. He wore blue jeans and a white shirt with the sleeves "pushed up." As Morris left the store, the man seemed to be "checking [him] out," apparently because he had noticed the revolver that Morris was carrying under his tee-shirt.

A few minutes later Regina Deasey and her sister, Dolores, pulled up to the store. As Dolores was alighting from the car, a short-haired, thin, light-complexioned black male came from the back of the store, opened the door, and told the sisters that

the store was closed. When they asked the man to repeat himself, he answered that the store was closed because of an emergency. As they left the parking lot, Regina noticed a maroon car in the lot.

At 12:30 Clayton Leihy and his wife, Yvonne, stopped at the Cumberland Farms to buy eggs. They noticed two automobiles in the lot, one a silver-gray compact, the other a red "sporty looking" car with a spoiler. As Mr. Leihy entered the store, a short-haired man with a "military type bearing" approached him and said he was closing the store. The man was slender and about five feet nine inches tall. He wore a light-colored short-sleeve shirt or jacket and tinted sunglasses. As she waited in the car, Mrs. Leihy also saw the man, whom she later described as a "[t]all, slender, young," light-skinned black or Hispanic male with "[v]ery close-cut hair." He was wearing blue jeans and a white top with short sleeves, which may have been rolled up.

When Mr. Leihy returned to the car, he and his wife saw the man walk behind the cash register, which was on the counter at the back of the store. The man picked up a plastic bread wrapper and wiped the counter with it. According to Mr. Leihy, "it was rather dark in the store."

On their way home, Mrs. Leihy, who had once worked for Cumberland Farms, told her husband that it was strange that the store was closing in the middle of the day. Normally the company did not close stores for any reason during business hours. The couple also commented that it was odd that two cars were in the parking lot, yet only one person was in the store. When they arrived home, Mrs. Leihy telephoned the Willingboro police to report her suspicions.

At about 12:40 Mark Thomas entered the Cumberland Farms. A number of other customers were inside. Thomas hollered for a clerk but received no answer. When he opened the door to the dairy case, Thomas saw a foot on the floor. He and Ronald Davis, another customer, opened the main door to the freezer

and saw a woman lying on the floor. Her left eye was "messed up," and her skin was "off-colored." Blood was on the floor near her head. Davis touched her neck but could not discern a pulse.

Walking behind the counter to call the police, Thomas saw blood "everywhere." As Thomas started to dial the telephone, Officer Payton drove into the parking lot. After seeing the body, Payton called for further assistance. Officer DePew responded to the call. Making his way to the counter, DePew saw dried, smeared blood on the counter, on the computer cash register, and on the floor. A plastic bread bag that had been torn open lay on the floor, and a few slices of bread were strewn about.

Meanwhile, Davis, Thomas, and Payton, detecting a faint pulse, attempted to resuscitate the victim. Paramedics arrived and took the victim to Rancocas Valley Hospital. Despite emergency surgery, doctors could not save Cynthia Barlieb's life.

During the subsequent investigation the police found a spent .32–caliber shell casing on the counter near the register. There were pry marks to the left of the register drawer and a bullet hole to the right. A dusting of the plastic bread bag uncovered a latent fingerprint.

Dr. Joseph DeLorenzo, the Chief Medical Examiner for Burlington County, performed an autopsy on Barlieb that same evening. The external examination of the body revealed three bullet wounds, one on the left side of her chest, another on the left portion of her neck, and the third on the left side of her skull. In Dr. DeLorenzo's opinion, the first shot had hit the victim's chest. Entering the body about two inches to the right of the nipple, the bullet had travelled downward, abraded the pericardial sac, penetrated the right dome of the diaphragm, and entered the liver. The next bullet had struck the victim three and one-quarter inches behind the left ear, lacerated her spinal cord, and lodged in the second cervical vertebra. The

final shot had entered the victim's skull four inches to the left of the midline, travelled directly vertically, and stopped in the victim's brain. The path indicated that the victim had been in a "much lower position" than her assailant and had possibly been lying on the floor when the third shot hit her. Dr. DeLorenzo removed lead fragments and three bullets from the body. According to Dr. DeLorenzo, Barlieb had died from massive cerebral and abdominal hemorrhaging due to gunshot wounds.

–B–

On leave from his army post at Fort Bliss, Texas, twenty-one-year-old Jacinto K. Hightower spent the July 4th weekend at his parents' house in Willingboro. He went out on the morning of July 7th to run some errands. After returning to pick up his wife, Michelle, and his daughter, Asia, he drove to Michelle's apartment at 668 Brooklyn Street in Philadelphia. Although Hightower had told his parents that he planned to leave for Fort Bliss that night, he and his wife returned to Willingboro. Upset that Hightower had not yet departed, his stepfather dropped him off at the airport and then took Michelle to her apartment. When Michelle arrived home she showed her roommate, Irene Williams, a small gun and a box with some bullets that she had with her. Michelle and Irene put the gun in their bathroom to hide it from Hightower. Later that evening Hightower showed up at the apartment, having decided to go AWOL.

At some point over the next few days, Hightower had a conversation with Williams' boyfriend, Christopher Forston. According to Forston, Hightower asked about a man named Carlton who was apparently having an affair with Michelle. Hightower wanted to meet Carlton in order to see "what his wife was sleeping with." If Carlton "didn't cooperate with him and talk right," he would kill him. Forston replied that Hightower could not "go around here killing people."

Hightower responded, "I play dangerous games. People do not like the games that I play." He then told Forston of having

once killed somebody, a woman in a "Pepperidge Farm Store." He said that he had gone to the store to buy Pampers; that he put the diapers on the counter and asked the clerk for a carton of cigarettes; that while the clerk retrieved the cigarettes, he walked to the door and changed the "open" sign to "closed"; that after returning to the counter, he put a tote bag on the counter and pulled out a gun; and that he asked the clerk to open the register, but "[t]hat old bitch won't cooperate. So I shot her one time in her chest." The woman fell to the floor but got back on her feet. When she refused Hightower's second request to open the register, he shot her in the neck. The clerk fell to the floor again. Hightower jumped across the counter and started banging on the computer cash register because he did not know how to open it. When he felt the clerk touch him, Hightower shot her in the head. He then turned off the lights and left the store.

Hightower also told Forston about a pair of his sunglasses. Although his "girl" wanted to wear them, he "broke them up" and threw them away because "they could get me in some trouble. They could lead to something that I've done."

Forston told Williams about his conversation with Hightower. At Michelle's request Forston later took the gun from the bathroom and hid it under Williams' bed.

Soon after his conversation with Forston, Hightower left for Texas. He again visited the east coast on medical leave on August 18th. When he arrived at Michelle's apartment, she was entertaining another man. Although Forston and Williams were also there, everyone was too afraid to let Hightower enter the apartment. One of them called the police, who removed Hightower from the premises.

The next day Sergeant Michael Scott Fitz–Patrick and Sergeant Edward V. Ryan of the Burlington County Prosecutor's Office went to the home of Irene Williams's mother. Earlier that week an unidentified source had linked Hightower to the murder of Cynthia Barlieb. From the statements of Williams,

her mother, Forston, and Michelle Hightower, the officers learned about the gun hidden in the apartment at 668 Brooklyn Street.

During the early morning hours of August 20th, Fitz–Patrick and Detective Donald Warren of the Willingboro Police Department went to Philadelphia to retrieve the gun. On their arrival they saw a Burgundy-red Plymouth Turismo that fit the description of the car parked at Cumberland Farms on the day of the murder. The officers found Hightower asleep in the car. When they asked him to accompany them to their office for an interview, Hightower replied that he was waiting for his wife. At Sergeant Fitz–Patrick's suggestion, Hightower agreed to leave a note for his wife explaining where he had gone.

The officers took Hightower to the Burlington County Prosecutor's Office in Mount Holly at 2:20 a.m. Hightower received *Miranda* warnings and signed a waiver card. After obtaining background information from Hightower, Sergeant Fitz–Patrick told him that the interview pertained to a murder committed at the Cumberland Farms on July 7th. Denying any knowledge of the murder, Hightower told Fitz–Patrick that he and his wife had gone to Philadelphia to visit Irene Williams on the afternoon of that day.

When asked if he had gone to a store that day, Hightower responded that he may have gone to an A & P and a gas station in Delran. He then changed his mind and said that he did not think he had gone to any store that day. Asked specifically if he had gone to the Cumberland Farms on Pennypacker Drive, Hightower stated that he never went to that store. The only convenience store he would ever go to, he added, was a Seven-Eleven on Salem Road.

Informed that he had been seen at the Cumberland Farms on July 7, Hightower repeated that he did not frequent that store. When Fitz–Patrick asserted that Hightower had bought diapers there that day, Hightower admitted that he had, but that he had forgotten until now. Continuing, Hightower said that he

had driven his stepfather's car, a Burgundy Plymouth Tourismo with a spoiler on the rear and racing stripes on the door, to the Cumberland Farms that day, probably around 11:00 a.m. He had parked the car in the lot in front of the store. He had been wearing blue jeans, white shoes, and a white jacket with the sleeves pushed up. He remembered having worn half-tinted sunglasses that day but could not recall whether he had worn them to the store. Hightower added that a picture of him had been taken that day in which he was wearing those clothes.

Fitz–Patrick asked Hightower if he had ever owned a gun, bought a gun, or given a gun to anyone. Hightower claimed he never had. When Fitz–Patrick showed him the pistol taken from the Brooklyn Street apartment earlier that morning, Hightower denied having ever seen the gun before.

Asked about the whereabouts of the sunglasses he had worn on July 7th, Hightower replied that his brother might have them. Although he denied having ever spoken to Forston about the murder or the gun, Hightower said he had talked to Forston to find out whom Michelle "had been with." At 3:56 a.m. Hightower gave a taped statement reflecting what he had told Fitz–Patrick. The tape was approximately forty-six minutes long. At 5:00 a.m. Sergeant Fitz–Patrick arrested Hightower for the murder of Cynthia Barlieb.

Fitz–Patrick told Hightower that his wife had given a taped statement. According to Fitz–Patrick, she said that Hightower had told her he had murdered Barlieb. Fitz–Patrick then played a portion of the statement.

Claiming his innocence, Hightower asked to take a lie-detector test. Fitz–Patrick summoned Lieutenant Robert Scara of the Burlington County Prosecutor's Office. After being informed again of his rights, Hightower signed a waiver form. Scara then conducted the polygraph examination. While Scara was interpreting the test results, Fitz–Patrick secured Hightower's consent to a search of the Plymouth Turismo.

Scara explained to Hightower that the polygraph results indicated that Hightower had "a problem" with some of the questions about the crime. Hightower asked to take another test. After the second test, Scara said that the results clearly showed that Hightower had been "directly involved in * * * the shooting of the victim."

Hightower asked to speak to Investigator James Bucs. He told Bucs that he had failed the polygraph but could not understand why because he was innocent. He spoke about his wife and child and said he did not want to go to jail. Bucs told Hightower that "the facts were beginning to weigh" against him.

Around noon on August 20th, the police took Hightower to the county jail. Later that afternoon Fitz–Patrick and Bucs brought Hightower back to their office. After informing Hightower of his rights again, they told him that the ballistic tests comparing the gun seized from his wife's apartment with the bullets recovered from Barlieb's body had been completed. When asked if he "knew" the results, Hightower replied that they "matched." After Hightower expressed a desire to return to his cell, Bucs declared that either he was the trigger man or he knew who was. Bucs told him to think about his family and the family of the victim. According to Bucs, Hightower's "eyes began to water and tears flowed from his eyes." Bucs took him back to the jail.

At the suggestion of his cellmate, Hightower called Willingboro Detective Gregory Rucker on September 4th and asked to meet with him. When Rucker arrived at the jail, Hightower insisted that the police had arrested the wrong person and that he knew who had had the gun. Rucker told Hightower that he would not discuss the homicide with him at that time.

Being unfamiliar with the case, Rucker went to the prosecutor's office for a briefing. He then returned to the jail and took Hightower to the Willingboro Police Station. Hightower signed another *Miranda*-waiver card.

This time Hightower gave a different version of his activities of July 7th. He said that he had gone to the Cumberland Farms on Pennypacker Drive at about 11:00 a.m. to buy diapers. He took with him a .32–caliber gun that he had bought in Texas. According to Hightower, he had purchased the gun because he had considered shooting his wife and himself. Hightower spent about five minutes in the store. He thought the clerk might have been a female but he was unsure.

Hightower then drove to Burlington City, where he met with a drug dealer known as "Sonny." He described Sonny as a black male, about five feet eight, one-hundred-and-fifty pounds, stocky build, light-complexioned. Sonny was twenty-six or twenty-seven years old and had a thick mustache and thick, wavy hair.

Hightower asked Sonny if he knew anyone who wanted to buy a gun. When Sonny said he would "check it out," Hightower handed him the box containing the gun. Sonny gave Hightower two marijuana cigarettes and walked off towards a bar.

Hightower then drove to his sister's house in Burlington. Although she was not home, Hightower claimed that a "Mrs. Odie" had seen him. Around 11:40 a.m. he returned to the intersection where he had met with Sonny. When Sonny came back, he returned the box containing the gun to Hightower, saying he had been unable to sell it. Hightower put the box under the seat of his car and returned to his home in Willingboro. After he and his wife had loaded the car with pots and pans, they drove to Philadelphia.

When Hightower had finished telling this story, Rucker attempted to question him about it, but Hightower became "very upset" and told Rucker to stop asking questions. At Hightower's request, Rucker took him back to the jail.

–C–

A Burlington County Grand Jury indicted Hightower for the purposeful murder of Cynthia Barlieb by his own conduct,

contrary to *N.J.S.A.* 2C:11–3a(1); the knowing murder of Barlieb by his own conduct, contrary to *N.J.S.A.* 2C:11–3a(2); the felony murder of Barlieb, contrary to *N.J.S.A.* 2C:11–3a(3); first-degree robbery, contrary to *N.J.S.A.* 2C:15–1; second-degree possession of a weapon for an unlawful purpose, contrary to *N.J.S.A.* 2C:39–4(a); and third-degree unlawful possession of a handgun, contrary to *N.J.S.A.* 2C:39–5(b).

Pursuant to *N.J.S.A.* 2A:11–3c(2) and *Rule* 3:13–4(a), the State served defendant with written notice of three aggravating factors that it would seek to prove during the penalty phase of defendant's trial: (1) the murder was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated assault to the victim, *N.J.S.A.* 2C:11–3c(4)(c); (2) the murder was committed for the purpose of escaping detection, apprehension, trial, punishment, or confinement for another offense committed by the defendant, *N.J.S.A.* 2C:11–3c(4)(f); and (3) the offense was committed while the defendant was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit robbery, *N.J.S.A.* 2C:11–3c(4)(g).

The State's case at trial was a juggernaut. The prosecution introduced evidence of a photographic array shown to Regina Deasey, Donald Morris, and Clayton and Yvonne Leihy. Both Deasey and Morris had positively identified defendant as being in the store that day. Although Mrs. Leihy had been unable to make a positive identification from the photographs, she had chosen defendant's photograph as most resembling the man she had seen in the store. Mr. Leihy had been unable to make a positive identification. At trial, Deasey, Morris, and the Leihys identified defendant as the man they had seen at the store on July 7, 1985. Morris indicated that a white jacket taken from Hightower's apartment resembled the one Hightower had worn that day. Deasey and the Leihys identified pictures of Hightower's Turismo as the red car they had seen in the convenience-store parking lot. The Leihys also identified photographs of Barlieb's Omni as the gray car they had seen.

Deasey thought Hightower might have been wearing a red tee-shirt, but she was not sure.

The jury heard convincing evidence that defendant had purchased the gun found in Michelle Hightower's apartment. A ballistics expert testified that that gun had fired the bullets extracted from the victim. The State introduced a photograph allegedly taken on July 7, 1985, that showed defendant wearing blue jeans, a white jacket, and half-tinted sunglasses.

Christopher Forston testified about Hightower's account of the "Pepperidge Farm Store" murder. The details of that story corresponded with much of the evidence that the State introduced: the clerk was a woman; defendant's description of how he had shot his victim three times conformed to the Barlieb-autopsy findings; the marks found on the computer cash register corroborated defendant's explanation of having banged on the computer register because he did not know how to open it; Hightower's recollection of having turned the lights off was consistent with Mr. Leihy's observation that the store had been "rather dark."

An FBI expert testified that the latent fingerprint found on the bloody bread bag belonged to defendant. The Leihys had seen defendant wiping the counter at the store with a bread wrapper at the time of the offense. The jury also heard Hightower's statement taken at the time of his arrest.

During the defense case, two officers testified that twelve people who had been at the Cumberland Farms on July 7th had been unable to identify Hightower's photo from the line-up. On cross-examination the State elicited the fact that those people had been at the store at various times that day, not necessarily while defendant was allegedly there. Moreover, one of those shown the lineup had picked Hightower's photograph as depicting a man that looked very similar to the one she had seen in the store. Another witness who had been at the store on July 7th testified that he had spoken with a short-haired, light-skinned black male in his early twenties but that he had been

unable to make a positive identification when shown a photo lineup. At trial he could not positively identify Hightower as the man he had seen in the store. On cross-examination, however, he stated that he had seen a car resembling defendant's in the parking lot.

The defense produced four other witnesses who had gone to the Cumberland Farms around 12:15 p.m. on the day of the murder. Two of them could not recall having seen defendant there. The third, Bruce Kerr, testified that he had seen a man who, although he looked like Hightower, was only about five foot five. The fourth witness, Cheryl Lyons, could not describe the man she had seen even after the State attempted to refresh her memory with an earlier statement in which she had given a description of a light-complexioned black male, five foot ten, medium build, middle to late twenties, wearing tinted sunglasses.

Testifying in his own behalf, defendant claimed that the picture of him wearing the white jacket, jeans, and sunglasses was taken on July 6th, not July 7th. He testified that on July 7th he had worn white slacks and a white fishnet shirt. He acknowledged ownership of the gun and recounted the "Sonny" story, which he had related to Detective Rucker. Now, however, Sonny's mustache was "faint" rather than "bushy." When asked why he had told Fitz–Patrick that he had never seen the gun before, defendant said that he had lied because he had been in a state of "shock." He explained that he had initially told Fitz–Patrick that he had not been in the Cumberland Farms on July 7th, because "I don't remember when I go to the store each day." When told that he had gone to the store to buy diapers that day, "it clicked." He conceded that his current recollection of the time-frame of his July 7th activities might not be consistent with his initial statement. He said that he did not have good relations with Williams or Forston. Finally, defendant insisted that he had not killed Cynthia Barlieb.

Among the facts brought out on cross-examination was that even under the "Sonny" story, Hightower had possession of the gun at the time Barlieb was murdered.

The final witness called by the defense, Detective Rucker, testified about the "Sonny story" that Hightower had given him on September 4, 1985. See *supra* at 394, 577 *A*.2d at 106.

After deliberating for four hours the jury convicted defendant on all five counts.

At the penalty phase the State introduced no additional evidence. The defense presented six expert witnesses: a psychologist, three psychiatrists, a social worker, and a criminologist. Defendant also invoked his right to allocution. He told the jury that sending a man "who professes his innocence" to prison for thirty years would instill "hatred and revenge towards the system" that had put him there. He asked the jury to sentence him to death so that "you and society [will] not * * * create a monster and then turn him loose on the world after thirty years."

The defense submitted five mitigating factors to the jury: (1) defendant was under the influence of extreme mental or emotional disturbance insufficient to constitute a defense to prosecution, *N.J.S.A.* 2C:11–3c(5)(a); (2) his age at the time of the murder, *N.J.S.A.* 2C:11–3c(5)(c); (3) his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was sufficiently impaired as the result of mental disease or defect, but not to a degree sufficient to constitute a defense to prosecution, *N.J.S.A.* 2C:11–3c(5)(d); (4) he had no significant history of prior criminal activity, *N.J.S.A.* 2C:11–3c(5)(f); and (5) any other factor relevant to his character or record or to the circumstances of the offense, *N.J.S.A.* 2C:11–3c(5)(h).

After three and one-half hours of deliberation, the jury found that the State had proven beyond a reasonable doubt all three aggravating factors alleged, namely, that the murder was wan-

tonly vile, that it was committed to escape detection for another offense, and that it was committed during a felony. Although the jury determined that defendant had established two mitigating factors, *N.J.S.A.* 2C:11–3c (5)(f) and (h), it held that each of the aggravating factors outweighed all the mitigating factors beyond a reasonable doubt and that all of the aggravating factors outweighed all the mitigating factors beyond a reasonable doubt. Based on those findings the court sentenced defendant to death.

## II

Defendant charges that he received ineffective assistance of counsel during jury selection. We recently applied the standard enunciated in *Strickland v. Washington,* 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674 (1984), and *State v. Fritz,* 105 *N.J.* 42, 519 *A.*2d 336 (1987), to ineffective-assistance claims in capital cases. *State v. Davis,* 116 *N.J.* 341, 561 *A.*2d 1082 (1989). The *Strickland/Fritz* standard provides that if counsel's performance was so incompetent as to render "the idea of a fair trial a nullity, no prejudice need be shown." *State v. Davis, supra,* 116 *N.J.* at 352, 561 *A.*2d 1082. Otherwise, defendant must meet a two-pronged test: counsel's assistance must have been deficient, and there must be "a reasonable probability that these deficiencies materially contributed to defendant's conviction * * *." *State v. Fritz, supra,* 105 *N.J.* at 58, 519 *A.*2d 336.

## –A–

■ The first alleged error is that counsel permitted a racially-disproportional jury panel. Two of the fifty-two members on the first panel were black; four of an unknown number on the second panel were black; four of the fifty members on the third panel were black; seven of the forty-one on the fourth panel were black; one of the forty-seven on the final panel was black. Defendant concludes that of the 190 people on the jury panels only fourteen, or 7.37%, were black. (In reaching that figure,

defendant apparently omitted the second panel. If the second panel is added using the figure of fifty-two (the highest number on the other panels) for the total number on the panel, of the 242 people on the panels eighteen, or 7.44%, were black. The disparity between that figure and defendant's does not affect our conclusions here.) Defendant claims that counsel was ineffective in failing to challenge the jury-selection process on equal-protection and fair-cross-section grounds.

–1–

In *State v. Ramseur*, 106 *N.J.* 123, 524 *A.*2d 188 (1987), we considered the standards for resolving such claims. The equal-protection clause requires that petit-juror selection be "free from any taint of discriminatory purpose." *Id.* at 215, 524 *A.*2d 188. To succeed on such a claim, a defendant must make out a *prima facie* case by satisfying three criteria. First, the defendant must identify "a constitutionally cognizable group." *State v. Ramseur, supra,* 106 *N.J.* at 215, 524 *A.*2d 188. Second, the defendant "must prove 'substantial under-representation' over a significant period of time." *Ibid.* (quoting *Castaneda v. Partida,* 430 *U.S.* 482, 494, 97 *S.Ct.* 1272, 1280, 51 *L.Ed.*2d 498, 510 (1977)). Third, the defendant must show discriminatory purpose by presenting statistics or by "demonstrating the use of racially non-neutral selection procedures * * *." *State v. Ramseur, supra,* 106 *N.J.* at 215–16, 524 *A.*2d 188; *see also State v. Coyle,* 119 *N.J.* 194, 212–14, 574 *A.*2d 951 (1990) (applying *Ramseur* criteria).

Although defendant has met the first criterion (blacks are a cognizable group), he has not provided support for the second. He presents no evidence of under-representation in the jury pool, nor does he compare the minority percentage in the pool with that in the population of Burlington County. Furthermore, he cites no proof that under-representation has occurred over a significant period of time. Indeed, the only evidence on this issue in the record points the other way. During jury selection the trial court indicated its reluctance to excuse a

black panelist: "There have been not the usual population of Blacks vis-a-vis Whites on any of these three panels. I know it's just pure coincidence, but I'm very reluctant at this early point to excuse him [for a job-related reason]." The court's remark suggests that, in its view at least, panels in Burlington County are normally more racially balanced.

Defendant fails to meet the third criterion as well. He cites no evidence, statistical or otherwise, of discriminatory intent. Defendant acknowledges that Burlington County compiles its petit-jury lists from motor-vehicle and voting records, a procedure that we have deemed "facially neutral." *State v. Ramseur, supra,* 106 *N.J.* at 224, 524 *A.*2d 188. Defendant does not suggest how that selection procedure is "non-neutral" here.

Because we find no evidence that the jury-selection procedure violated defendant's equal-protection rights, his counsel was not remiss in failing to object.

–2–

█ The sixth amendment requires that petit-juror pools represent a "fair cross-section" of the community. *Duren v. Missouri,* 439 *U.S.* 357, 368 n. 26, 99 *S.Ct.* 664, 670 n. 26, 58 *L.Ed.*2d 579, 589 n. 26 (1979). A defendant alleging a violation of that requirement must meet a *prima facie* test similar to that for an equal-protection claim. The defendant must identify a constitutionally-cognizable group, show that representation of that group over a period of time has not been "fair and reasonable," and show that the under-representation was due to systematic exclusion.

█ Again, defendant has met the first prong and failed the second and third. He has presented no proof that systematic exclusion of blacks has resulted in unfair and unreasonable under-representation in jury pools over a period of time. Likewise, he has not shown that systematic exclusion caused any under-representation. As with the equal-protection claim, defense counsel's failure to object to the composition of the jury pool did not amount to ineffective assistance.

–B–

 Defendant also alleges that counsel's representation during jury selection was deficient because he tried "to keep several individuals who would obviously have been destructive to the defendant's cause." Juror Weiner sought to be excused because she had learned about the case from witness Regina Deasey, a co-worker, and because defendant's sister was a job-training client of hers. Weiner said that although she would feel guilty if she helped convict defendant, she believed she would not be prejudiced. The court denied the State's motion for excusal for cause, in part due to defense counsel's effort to retain the juror.

During *voir dire* Weiner again stated that she could fairly evaluate both sides of the case. She added, however, that if she voted for a death sentence, she would feel awkward dealing with defendant's sister. She further explained that she knew what the testimony of Deasey would be and that she thought defendant was guilty. Despite defense counsel's arguments, the court excused Weiner for cause.

Defendant's contention that counsel's attempt to retain Weiner constituted ineffective assistance fails both prongs of *Strickland/Fritz*. Clearly there was no prejudice: despite counsel's position, the court excused the juror for cause. Furthermore, counsel's conduct was strategically defensible. Although Weiner demonstrated bias toward conviction, her relationship with defendant's sister indicated that she might sympathize with him during penalty-phase deliberations. The fact that the State sought Weiner's excusal tends to support that view. Defense counsel's actions fell within the zone of reasonable professional performance. See *Wicker v. McCotter*, 783 *F*.2d 487, 494–95 (5th Cir.) (acceptance of juror who expressed possible problems with defendant's decision not to testify, but whose background suggested that he might be inclined to accept defendant's theory of the case, was a strategic decision demonstrating

"effectiveness, not ineptness"), *cert. denied,* 478 *U.S.* 1010, 106 *S.Ct.* 3310, 92 *L.Ed.*2d 723 (1986).

Defendant also challenges counsel's failure to seek excusal of juror Iashburn. Iashburn said he had formed an opinion concerning defendant's guilt after having read about the case in newspapers. The juror also mentioned that his brother was in a Virginia prison for having shot someone. Neither side objected to the court's finding that Iashburn was death-qualified.

Defendant's claim of ineffective assistance here also fails both prongs of the *Strickland/Fritz* test. First, defendant suffered no prejudice. Iashburn never became a member of the jury, nor did defendant expend a peremptory challenge on him. Second, counsel may have thought that because Iashburn's brother was in prison, he would sympathize with defendant.

Finally, defendant argues that the trial court erroneously excused juror Montesjardi, who, after initially being accepted as a member of the jury, returned to the court and expressed doubts about her ability to impose a death sentence. Defendant contends that Montesjardi's excusal violated the standard enunciated in *Adams v. Texas,* 448 *U.S.* 38, 100 *S.Ct.* 2521, 65 *L.Ed.*2d 581 (1980), and adopted by this Court in *State v. Ramseur, supra,* 106 *N.J.* at 255–56, 524 *A.*2d 188. Under *Adams,* "a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." 448 *U.S.* at 45, 100 *S.Ct.* at 2526, 65 *L.Ed.*2d at 589. A violation of that standard mandates reversing the death sentence, not the conviction. *Id.* at 51, 100 *S.Ct.* at 2529, 65 *L.Ed.*2d at 593; *see Gray v. Mississippi,* 481 *U.S.* 648, 668, 107 *S.Ct.* 2045, 2057, 95 *L.Ed.*2d 622, 640 (1987) (death penalty reversed due to trial court's improper excusal for cause of juror for opposition to death penalty). Because the State concedes that the penalty phase must be retried, the issue of the excusal of juror Montes-

jardi is moot. Likewise, we need not consider whether defense counsel's failure to object amounted to ineffective assistance.

–C–

■ The excusal of juror Montesjardi left a panel of fifteen jurors. The State indicated that it had no objection to proceeding with only fifteen. However, defense counsel, who had exercised all twenty-five of his peremptory challenges, preferred to have sixteen. At his suggestion the trial court randomly selected a sixteenth juror from the remaining members in the pool. The selected juror, Ders, eventually deliberated at the guilt phase and penalty proceeding.

Defendant contends that his attorney should have moved for a mistrial, asked for additional peremptories, or accepted the panel of fifteen jurors who had survived peremptories. Defendant, however, alleges no prejudice. He does not suggest that juror Ders was biased in any way. During *voir dire* neither party had sought to excuse her for cause. The selection of juror Ders did not violate defendant's right to trial by a fair and impartial jury.

III

Defendant claims that this Court should reverse his conviction because of his counsel's incompetence during the guilt phase of the trial. He contends that from the beginning of the trial his counsel essentially conceded guilt and "gave up." We note at the outset that in light of the strength of the State's case, defendant will have a difficult time meeting the prejudice prong of the *Strickland/Fritz* test.

–A–

■ According to defendant, counsel's opening and closing statements signalled belief in defendant's guilt and distanced counsel from his client. During his opening, counsel told the jury that its duty was

[n]ot only to perhaps decide simply the issue of guilt or innocence, but also to deal with potentially what penalty would be appropriate. Your only options: essentially life imprisonment in a cage or the ultimate sanction of death.

During his closing, counsel explained his role:

And what is the obligation of every defense attorney who has sat or ever will sit in that chair across the courtroom? The men who sit there are not free to quit in the face of overwhelming adversity. They're not free to lay down and play dead before the jury at any time. Each one of the men who has ever or will ever sit there like I has sworn allegiance to a system which, although not perfect, is the cornerstone of our free society and that is a free adversarial system where both sides come into a public courtroom and present the evidence to you and ask you for your fair and honest evaluation under the law.

The men who sit and will sit in that chair over there come forward continuously to defend unpopular causes and unpopular people. They fight for the innocent and the guilty, for the good and the bad. And you as American citizens need only to worry about your life and liberty when there are no longer any men available who are willing to shoulder what is so many times very unpopular burdens.

My obligation at this time is to come forward and review the evidence with you in the light most favorable to my client, Joey Hightower. To do otherwise would be to pervert our system of justice and simply deprive both Cynthia Barlieb and Joey Hightower of justice under our law.

In support of his argument that those remarks mandate reversal of his conviction, defendant cites several cases in which defense counsel expressly conceded guilt to the jury. In *Magill v. Dugger*, 824 *F.*2d 879 (11th Cir.1987), the defendant, having confessed killing the victim, asserted that he did not have the *mens rea* for first-degree murder. The court found that the defense attorney had been ineffective in failing to explain that argument during his opening and closing statements. "[C]ounsel's rebuttal closing argument gave no reasons upon which the jury could reduce the charge of capital murder to second degree murder." 824 *F.*2d at 888. The court held that counsel's incompetence did not in itself mandate a reversal of conviction; however, in combination with other errors during the penalty phase, including failure to introduce mitigating evidence, the deficient opening and closing statements required reversal of the death sentence.

In *Francis v. Spraggins*, 720 *F.*2d 1190 (11th Cir.1983), *cert. denied*, 470 *U.S.* 1059, 105 *S.Ct.* 1776, 84 *L.Ed.*2d 835 (1985),

the defendant denied on the stand any knowing participation in the charged crimes. Nevertheless his counsel told the jury during his closing: "I think he went in the house and I think he committed the crime of murder * * *." 720 *F.*2d at 1194. Noting that the expression of personal belief in guilt would be improper even for a prosecutor, the court determined that counsel's conduct was "irrational and rendered his assistance at trial ineffective." *Ibid.*

Defendant also cites *Young v. Zant,* 677 *F.*2d 792 (11th Cir.1982), in which the defense counsel made several critical errors during trial. First, the attorney raised the insanity defense "without evidence to support it." 677 *F.*2d at 798. Second, he failed to discern "the obvious defenses" that would highlight the prosecution's "extremely thin" evidence on particular elements of the offenses. *Id.* at 798–99. Although finding that those deficiencies alone showed that counsel's conduct "fell far short of that required of counsel in a criminal trial," *id.* at 799, the court observed that the attorney's indefensible decision at summation to concede his client's guilt to all three crimes charged compounded the problem. The court reversed the defendant's convictions. Finally, defendant refers to *Wiley v. Sowders,* 647 *F.*2d 642, 644 (6th Cir.), *cert. denied,* 454 *U.S.* 1091, 102 *S.Ct.* 656, 70 *L.Ed.*2d 630 (1981), in which the defense counsel's summation contained "several unequivocal admissions" of guilt, thereby violating the defendant's sixty- and fourteenth-amendment rights, which required reversal of his conviction.

All four cases are distinguishable from this one. First, counsel here never conceded guilt. Second, during the bulk of his summation, counsel attempted to introduce reasonable doubt concerning eye-witness testimony to highlight possible witness bias or self-interest and to make defendant's alibi stand up in the face of contradictory evidence. Third, defendant does not allege that his lawyer failed either to investigate possible defenses or to present exculpatory evidence. Finally, *Francis, Young,* and *Wiley* were all pre-*Strickland* cases. None of

those courts determined whether counsel's conduct affected the verdict.

Defendant also alleges that counsel's opening and closing distanced the attorney from his client. Defendant cites two precedents for reversal. In the pre-*Strickland* case of *Goodwin v. Balkcom*, 684 *F.*2d 794 (11th Cir.1982), *cert. denied,* 460 *U.S.* 1098, 103 *S.Ct.* 1798, 76 *L.Ed.*2d 364 (1983), the defense lawyers informed the jury that they were appointed counsel. The Eleventh Circuit stated that "reminding a jury that the undertaking is not by choice, but in service to the public, effectively stacks the odds against the accused." 684 *F.*2d at 806. But the court did not base its reversal on that ground. It made that observation only to illustrate the defeatist attitude of counsel underlying the actual bases for finding ineffectiveness: the lack of investigation and the failure to raise a credible challenge to the composition of the grand jury. *Id.* at 817.

Defendant also refers to the post-*Strickland* case of *King v. Strickland,* 714 *F.*2d 1481 (11th Cir.1983), *vacated* and *remanded,* 467 *U.S.* 1211, 104 *S.Ct.* 2651, 81 *L.Ed.*2d 358, on *remand,* 748 *F.*2d 1462 (11th Cir.1984), *cert. denied,* 471 *U.S.* 1016, 105 *S.Ct.* 2020, 85 *L.Ed.*2d 301 (1985). During the penalty phase in *King,* defense counsel told the jury that he was a public defender who had never been "in a position like this" and that he appreciated how "evil and gross" the crime was. 714 *F.*2d at 1491. Finding ineffective assistance under the *Strickland* standard, the *King* court noted on remand that counsel's "weak closing argument" had been coupled with the failure to present available character witnesses in mitigation. 748 *F.*2d at 1464. Reversing the penalty phase, the court noted that the defendant's conviction was based on circumstantial evidence, whereas *Strickland v. Washington* was "a case of clear guilt based on confessions and pleas of guilt to three capital murder charges." *Ibid.*

The situation here is much different from those in *Goodwin* and *King.* Although the jury might have inferred that defense

counsel had been appointed, such a statement was not express-
ly made. Moreover, counsel's remarks during the opening and
summation were made in the context of describing the duties of
each participant in the trial process. Defendant does not allege
any failure to investigate issues or present exculpatory evi-
dence. Finally, even if counsel's opening and closing were
deficient, given the strength of the State's case, we do not
believe they materially affected the jury's verdict.

–B–

■ As further evidence of inadequate representation, de-
fendant points to his counsel's cross-examination. Defendant
argues that counsel could have asked more questions of Fitz–
Patrick, Bucs, and Rucker "to attempt to establish reasonable
doubt." He does not indicate, however, what questions counsel
should have asked and how the answers would have affected
the verdict.

■ Defendant also cites counsel's failure to object when
Barbara J. Britt, the manager of the apartment building in
Texas in which defendant had lived, testified that defendant
had painted his apartment orange. Counsel did not object when
another witness, Tina Booker, said that she had processed
defendant for going AWOL and that he had later left a note for
her at her home.

Britt's remark about defendant's orange apartment was in
response to a question about whether there was "any particular
reason" she remembered defendant. Although defense counsel
did not object at that point, he did object to the State's next
question: "Did you have any other problems with Mr. Hightow-
er?" The trial court overruled the objection. Britt then told of
rent-collection problems with defendant.

Assuming that portions of Britt's and Booker's testimony
were objectionable, we do not believe that objections by counsel
followed by curative instructions would have materially affect-
ed the verdict. Thus even if defendant could meet the first

prong of the *Strickland/Fritz* test by showing inadequacy of representation, he cannot meet the "prejudice" prong.

Defendant also contends that counsel was remiss in not questioning Irene Williams and Christopher Forston about their strained relationships with defendant and about their possible bias. On cross-examination, however, Forston said that he had a cordial, but not close, relationship with Hightower. Counsel may have avoided questioning Williams along those lines for fear that she might contradict defendant's later testimony. Moreover, during the defense case counsel did elicit testimony about defendant's coolness toward Williams and Forston. In his summation counsel told the jury to consider the relationship among the witnesses because "it's really quite clear that it was Michelle [Hightower], Christopher Forston and Irene Williams against" Hightower. The strategic decisions regarding the latter two witnesses did not constitute ineffective assistance.

Defendant argues further that counsel's failure to cross-examine Dr. Joseph DeLorenzo, the coroner who had performed the autopsy, and Clyde Ottinger, a fingerprint expert, constituted ineffective representation. Nowhere does defendant suggest what questions counsel should have asked Ottinger. He asserts that counsel should have cross-examined DeLorenzo about his "speculative" conclusion that Barlieb was lying on the floor when the third shot hit her, and claims that that issue may have been crucial in the jury's finding of aggravating factor c(4)(c). Because the State concedes that the penalty phase must be retried, the point is moot.

As another example of inadequate representation defendant refers to his lawyer's failure to have objected to the admissibility of three photographs taken of the victim during the autopsy. Defendant argues that those pictures were inflammatory and cumulative. The record, however, does not show that admission of the photographs amounted to a "palpable abuse" of the trial court's discretion. See *State v. Thompson*, 59 *N.J.* 396, 420, 283 *A.*2d 513 (1971).

–C–

Defendant contends that Sergeant Fitz–Patrick made an inadmissible hearsay statement. When asked about his activities during the early morning of August 20, 1985, Fitz–Patrick replied:

Well, on August 19th, the week of August 19th, we had received information from several people in the Philadelphia area as to who was responsible for the murder of Cynthia Barlieb and based on that information we drove over to Philadelphia to retrieve the handgun that had been used in the murder and it was located at 668 Brooklyn Street in Philadelphia.

At that time we were aware that Jacinto Hightower was the person responsible for the murder and when we were going over to that area to retrieve the gun, we weren't aware that he was going to be present at the—in the vicinity of the residence.

Defense counsel did not object to that statement, nor did the trial court comment on it. According to defendant, counsel's failure to object and the trial court's failure to grant a mistrial *sua sponte* are both reversible errors.

Defendant claims that Fitz–Patrick's statement violated his sixth-amendment right to confront witnesses. *See State v. Bankston*, 63 *N.J.* 263, 307 *A.*2d 65 (1973). In *Bankston* this Court held that the harmless-error standard is appropriate in such circumstances. For a hearsay error to mandate reversal, "[t]he possibility [of an unjust verdict] must be real, one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." *Id.* at 273, 307 *A.*2d 65. Considering the strength of the State's case, the length of the trial, and the number of witnesses called, we find that Fitz–Patrick's brief reference to information incriminating defendant is harmless error. That finding compels the conclusion that defense counsel's failure to object, even if it was error, does not meet the prejudice prong of the *Strickland/Fritz* test.

–D–

Defendant's last claim regarding ineffective assistance during the guilt phase is the most serious. The State's first witness was David Barlieb, the victim's husband. In response

to the prosecutor's questioning, Barlieb testified that his wife's birthday was October 30, 1959. The prosecutor used that fact in concluding his summation during the guilt phase:

> Today is October 30th, 1986. Had it not been for Joey Hightower, ladies and gentlemen, Cynthia Barlieb would be twenty-seven years old today. Today is her birthday.

Defense counsel did not object to that statement.

Before considering whether counsel's failure to object constituted inadequate representation, we address the issue of whether the statement itself warrants reversal of defendant's conviction. "To justify reversal the prosecutor's conduct must have been 'clear[ly] and unmistakabl[y]' improper, and the improper conduct must have resulted in substantial prejudice to the defendant's fundamental right to have a jury fairly assess the persuasiveness of his case." *State v. Williams*, 113 *N.J.* 393, 452, 550 *A.*2d 1172 (1988) (quoting *State v. Bucanis*, 26 *N.J.* 45, 56, 138 *A.*2d 739, *cert. denied*, 357 *U.S.* 910, 78 *S.Ct.* 1157, 2 *L.Ed.*2d 1160 (1958)).

The prosecutor's statement was clearly and unmistakably improper. His tactic, plainly designed to impassion the jury, stands out as a glaring departure from the high level of professionalism that otherwise characterized the conduct of both the prosecution and the defense during this trial. The statement about the victim's age and birthday "contain[ed] nothing that would aid the jury in determining the defendant's guilt or innocence." *State v. Williams, supra*, 113 *N.J.* at 452, 550 *A.*2d 1172. The prosecutor's conduct was particularly egregious because the statement came at the end of his summation. "Conceding that any capital case will be prone to emotional displays by those giving testimony, surely it is not too much to expect and require that officers of the court conduct themselves without resorting to improper appeals to the jury's emotions." *Id.* at 453, 550 *A.*2d 1172.

The question then becomes whether the prosecutor's conduct prevented the jury from fairly assessing defendant's case. We conclude that although it calls for our strong disapproval, the

statement does not necessitate reversal. The prejudicial comment came at the end of a long summation that was "largely devoted to a fair review of the evidence." See *State v. Tirone*, 64 *N.J.* 222, 229, 314 *A.*2d 601 (1974). Moreover, the length of the trial, the number of witnesses, and the strength of the State's case served to minimize any prejudice.

 Our finding that the prosecutor's statement did not substantially prejudice the jury's ability fairly to assess defendant's case compels the conclusion that defense counsel's failure to have objected does not meet the prejudice prong of the *Strickland/Fritz* test.

–E–

 Having dismissed each of defendant's specific allegations of attorney incompetence, we now also reject his contention that those perceived errors taken together demonstrate ineffective assistance of counsel during the guilt phase. Defendant argues that "[t]he cumulative effect of counsel's actions left defendant without the undivided allegiance of a zealous advocate." We disagree. Faced with a difficult case, defense counsel attempted to highlight what few weaknesses there were in the State's case. Although he did not cross-examine the State's experts, he attempted to mitigate the effect of eyewitness testimony by drawing out discrepancies and casting doubt on eyewitness accuracy. Moreover, counsel elicited information demonstrating the bias of Williams and Forston by cross-examination and by the direct testimony of defendant. Defendant makes no allegation that counsel did not thoroughly investigate his case.

–F–

 Finally, we address briefly one issue not raised by defendant. In *State v. Gerald*, 113 *N.J.* 40, 69, 549 *A.*2d 792 (1988), we held that "a defendant who is convicted of purposely or knowingly causing 'serious bodily injury resulting in death'

under *N.J.S.A.* 2C:11–3(a)(1) and (2), or either of them—as opposed to one who is convicted of purposely or knowingly causing death under those same provisions—may not be subjected to the death penalty." Unable to discern which offense the jury had found, we reversed the defendant's capital-murder conviction and remanded the matter for a new trial. *Id.* at 91–92, 549 *A.*2d 792.

In sharp contrast to *Gerald* the record in this case contains absolutely nothing that would support a serious-bodily-injury murder charge—which is doubtless why defendant does not make the *Gerald* argument. Defendant denied complicity in the murder, so there is not a word in his own testimony about how he intended only to wound or "stop" his victim, see *State v. Coyle, supra,* 119 *N.J.* at 210–11, 574 *A.*2d 951, nor would the version of the shooting that he gave Forston, see *supra* at 204–05, 574 *A.*2d 951, provide a rational basis for a jury finding that defendant's purpose was to inflict serious bodily injury rather than death. *See State v. Coyle, supra,* 119 *N.J.* at 212, 574 *A.*2d 951.

Defendant shot the victim with a .32–caliber handgun from close range in the chest, the neck, and the head. The first bullet narrowly missed the victim's heart before lodging in her liver, the second severed her spinal cord, and the third shot penetrated the victim's skull and lodged in her brain. After shooting her, defendant dragged the victim into the freezer. The record fully supports the prosecutor's argument in summation that anyone who commits such acts is "intending to kill that person," that defendant "had formed his intent to kill her when he walked into that store," and that the evidence "could lead you to only one conclusion: He went into that store with the fully formed intent to rob it and execute the clerk so she couldn't identify him * * *." Here, as in *State v. Pitts,* 116 *N.J.* 580, 562 *A.*2d 1320 (1989), "it would be virtually 'inconceivable' that a jury could have concluded that defendant intended to cause serious bodily injury * * * but not death." *Id.* at 620,

562 *A*.2d 1320. Therefore, the trial court did not err in failing to charge the jury on serious-bodily-injury murder.

We affirm defendant's murder conviction.

### IV

Because the State concedes that the death sentence must be vacated, we need discuss only those issues that might arise again during resentencing. We will not address defendant's claims of ineffective assistance of counsel. In regard to most of the jury-instruction issues, we assume that on retrial the court will take heed of the capital cases decided since the original penalty phase, in which we have resolved the same questions as defendant raises here.

### -A-

Defendant asks us to rule that the trial court should not have allowed him to ask the jury to sentence him to death. He argues that in upholding a capital defendant's right to allocution in *State v. Zola,* 112 *N.J.* 384, 428–32, 548 *A*.2d 1022 (1988), this Court limited that right to pleas for mercy only. Moreover, according to defendant, allowing a capital defendant to ask the jury for a death sentence would contravene the purposes of requiring his counsel to present mitigating evidence.

In *Zola* we tailored a narrow right for a capital defendant to make "an unsworn personal statement to the jury" during the penalty phase. 112 *N.J.* at 429, 548 *A*.2d 1022. Our decision rested not on constitutional grounds but on "what our civilization commends." *Ibid.* We declared that "it bespeaks our common humanity that a defendant not be sentenced to death by a jury 'which never heard the sound of his voice.'" *Id.* at 429–30, 548 *A*.2d 1022 (quoting *McGautha v. California,* 402 *U.S.* 183, 220, 91 *S.Ct.* 1454, 1474, 28 *L.Ed.*2d 711, 733 (1971), *vacated on other grounds,* 408 *U.S.* 941, 92 *S.Ct.* 2873, 33 *L.Ed.*2d 765 (1972)).

In exercising that narrow right, a defendant is not "permitted to rebut any facts in evidence, to deny his guilt, or indeed, to voice an expression of remorse that contradicts evidentiary facts." *Id.* 112 *N.J.* at 430, 548 *A.*2d 1022. Requesting a death sentence does not overstep any of those guidelines. Although such a statement is not "mitigating" in the sense that Zola's proffered plea for mercy was, still it allows the jury to see the defendant in a light not encumbered by legal requirements. The right of allocution may be seen as affording an opportunity for the jury to learn about the "whole person."

Our decision to allow a capital defendant to ask for a death sentence does not contravene our requirement that his counsel must provide evidence of mitigating circumstances even over the defendant's objection. In *State v. Koedatich*, 112 *N.J.* 225, 548 *A.*2d 939 (1988), *cert. denied*, 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L.Ed.*2d 803 (1989), we required a defendant to provide mitigating evidence, citing several policy reasons "based substantially on the State's 'interest in a reliable penalty determination.'" 112 *N.J.* at 330, 548 *A.*2d 939 (quoting *People v. Deere*, 41 *Cal.*3d 353, 364, 710 *P.*2d 925, 931, 222 *Cal.Rptr.* 13, 20 (1985)). Requiring a jury to consider mitigating evidence is necessary to prevent death sentences that are "wantonly and * * * freakishly imposed." *Furman v. Georgia*, 408 *U.S.* 238, 310, 92 *S.Ct.* 2726, 2762, 33 *L.Ed.*2d 346, 390 (1972) (Stewart, J., concurring). Consideration of mitigating circumstances is essential to individualized determinations. Refusal to present mitigating evidence prevents the jury from considering crucial information in making its decision. Without a record concerning mitigating evidence we would be unable to fulfill our constitutional and statutory duty to review the proportionality of a defendant's sentence.

Allowing a defendant to request a death sentence does not contravene any of the foregoing policies. The jury will still have all the evidence in determining the proper sentence, and we will have a full record in reviewing the appropriateness of that sentence.

█ When a trial court becomes aware of the defendant's intention to ask for a death sentence, it should follow the procedures we outlined in *State v. Zola, supra,* 112 *N.J.* at 431–32, 548 *A.*2d 1022. We add that, as in this case, a trial court may want to provide for a psychiatric examination of the defendant. In addition, the trial court must instruct the jurors that it is only their opinions, not those of the defendant or the attorneys, that must guide them in connection with the appropriate penalty.

–B–

█ During the penalty phase the trial court quashed defendant's subpoena directed to a member of the State Parole Board. Defendant intended to tie parole-criteria testimony to statistical evidence concerning prospects for rehabilitation, future release, and recidivism. The trial court held that the proposed testimony would be too speculative given the possibility of changes in parole criteria and that it would have no bearing on the issue of defendant's character. The court told the jury that if it found the death penalty inappropriate for this defendant, the sentence would be life imprisonment with thirty-years parole ineligibility.

Evidence proffered by a defendant at the penalty phase must be "relevant to * * * [the] defendant's character or record, or to the circumstances of the offense." *State v. Gerald, supra,* 113 *N.J.* at 103, 549 *A.*2d 792 (citing *N.J.S.A.* 2C:11–3c(5)(h)). The trial court correctly ruled that testimony regarding the standards for parole has no relevance to defendant's character or record, nor to the circumstances of his offense.

The California Supreme Court has observed that twenty-five other jurisdictions have determined that the jury should not consider the possibility of pardon, parole, or commutation. Only three jurisdictions have ruled otherwise. *People v. Ramos,* 37 *Cal.*3d 136, 156 n. 10, 689 *P.*2d 430, 442 n. 10, 207 *Cal.Rptr.* 800, 812 n. 10 (1984) (invalidating instruction regard-

ing Governor's ability to commute life sentence), *cert. denied,* 471 *U.S.* 1119, 105 *S.Ct.* 2367, 86 *L.Ed.*2d 266 (1985). Those possibilities involve speculation about future actions of people other than defendant, resulting in the "interjection of an unquantifiable factor into the deliberation process, thereby rendering the decision arbitrary." *Id.* at 157, 689 *P.*2d at 442, 207 *Cal.Rptr.* at 812 (quoting *State v. Lindsey,* 404 *So.*2d 466, 487 (La.1981), *cert. denied,* 464 *U.S.* 908, 104 *S.Ct.* 261, 78 *L.Ed.*2d 246 (1983)). This Court prohibited parole and commutation testimony under New Jersey's former death-penalty act. See *State v. White,* 27 *N.J.* 158, 177, 142 *A.*2d 65 (1958). As the State notes, exclusion of such testimony does not preclude evidence of defendant's prospects for rehabilitation. The trial court ruled correctly.

 The foregoing considerations also lead us to conclude that the trial court appropriately excluded proffered evidence concerning racial imbalance in the imposition of the death penalty. Specific evidence of racial discrimination against defendant might be relevant during the penalty phase. Allegations of a pattern of discriminatory application of the death penalty, however, have no bearing on defendant's character or record or on the circumstances of his offense.

 The trial court also correctly ruled that proffered testimony concerning the deterrent effect of the death penalty was inadmissible. See *State v. Rose,* 120 *N.J.* 61, 576 *A.*2d 235 (1990); *State v. Bey* II, *supra,* 112 *N.J.* at 146–47, 548 *A.*2d 887.

-C-

[26] During the penalty phase Dr. Mona Margarita, a criminologist, offered statistical evidence concerning the rate of recidivism among paroled murderers. An expert in the area of statistics and criminology, Dr. Margarita testified that all of the studies on the subject concluded that the recidivism rate for murderers indicated that compared to other felons, they pose

the least risk of committing offenses after being paroled. At no time during her direct testimony did she mention race.

On cross-examination the prosecutor asked Dr. Margarita about the findings of a study by a Dr. Marvin Wolfgang entitled *Patterns of Criminal Homicide.* After making sure that Dr. Margarita was "aware that Mr. Hightower is a Negro male age 23," the prosecutor directed the witness to a table reflecting "the rate of homicides for Negro males age 50 to 54." Following an exchange about the data for discrete demographic groups, the prosecutor asked Dr. Margarita:

Q. I would be correct, wouldn't I, Doctor, in interpreting this study as saying that Black males age 50 to 54, which is how old Mr. Hightower will be if he's paroled at the expiration of his 30 years, commit more crimes than * * * males [in the general population] age 20 to 24, according to this study?

\* \* \* \* \* \* \* \*

A. Yes.

\* \* \* \* \* \* \* \*

Q. Does it not say that people in that age group that I've described Mr. Hightower belonging to commit 29.4 homicides per 100,000? It says that; doesn't it?

A. Yes.

Q. And it says as far as the general population is concerned, that males age 20 to 24 who you identified as the group most prone to commit murders, according to this study, commit 12.6 homicides per 100,000? It says that; doesn't it?

\* \* \* \* \* \* \* \*

A. Yes, sir.

At that point defendant moved for a mistrial. Although it denied the motion, the trial court struck from the record any "testimony having to do with the percentage of recidivistic homicides or percentage of homicides in anything other than the general population." The court reasoned that the information did not have "any place in the courtroom, because of the danger of it being misapplied, because of the danger of an emotional flare-up based on race." Therefore, the court instructed the jury to disregard the testimony.

The prosecutor's line of questioning was improper. Only one chain of inferences is possible from the cross-examination:

defendant is a black male; the study shows that black males have a higher rate of recidivism than do whites; defendant is more likely to kill again merely because he is a black male; therefore defendant's race weighs in favor of a death sentence.

■ The trial court was correct in striking the entire line of questioning. A defendant's race should never be a factor in the determination of a sentence, whether in a trial for a murder or for a traffic offense. Because the penalty phase must be retried anyway, we need not rule on whether the cross-examination was ground for a mistrial. However, we caution that if in the future a party in a capital case seeks to elicit statistical testimony on direct or cross-examination that might have racial implications, it must alert the trial court, out of the jury's presence, about its intentions. As we noted in *State v. Davis*, 96 *N.J.* 611, 623 n. 2, 477 *A.*2d 308 (1984), the use of a racial variable in a statistical analysis "may have unacceptably invidious implications, bearing upon the ultimate admissibility of the expert's testimony." The trial court must use great caution in exercising its discretion to admit such statistical evidence.

–D–

Defendant alleges several errors concerning the trial court's treatment of aggravating and mitigating circumstances. We do not address those errors in the jury charge arising from the fact that this trial occurred before our decisions in *State v. Ramseur, supra*, 106 *N.J.* 123, 524 *A.*2d 188, and subsequent death-penalty cases. We assume that the trial court will heed them in the resentencing proceedings.

■ Defendant contends that the evidence does not support a finding of aggravating circumstance c(4)(c). In *Ramseur* we narrowed the wantonly-vile aggravating circumstance to cover only two types of murder. The first class applies to a murder in which the perpetrator "intended to cause, and did in fact cause, severe physical or psychological pain or suffering to the victim prior to the victim's death." 106 *N.J.* at 211, 524 *A.*2d

188. The second type, "depravity murders," refers to a murder that "served no purpose for the defendant beyond his pleasure of killing." *Ibid.*

The State acknowledges that the evidence does not support a finding of a depravity murder. It argues, however, that the murder falls within the first category. According to the State, defendant's first shot was "a deliberate effort to terrorize the victim." The State contends that the victim was in severe physical agony following the first shot and that she was aware of "her impending and certain death at defendant's hands."

Because the trial occurred before our opinion in *Ramseur*, the trial court did not analyze the evidence under our narrow construction of c(4)(c). In light of the factual nature of that issue, it would be inappropriate for us to determine whether c(4)(c) is applicable here until the trial court has had a chance to evaluate the evidence. We do observe, however, that the State must provide evidence from which the jury could rationally conclude beyond a reasonable doubt that in missing the victim's heart by inches on his first shot, defendant intended not to kill her but only to wound her.

Defendant also argues that the trial court should not have charged on aggravating circumstance c(4)(f), which applies to murder "committed for the purpose of escaping detection, apprehension, trial, punishment or confinement for another offense committed by the defendant or another * * *." Defendant asks us to interpret that factor to cover only "prior offenses and not contemporaneous ones." Otherwise, defendant contends, that circumstance would duplicate c(4)(g) in every murder involving a robbery, sexual assault, arson, burglary, or kidnapping.

We disagree. The wording of c(4)(f) does not imply that it is limited to prior offenses. If the legislature had intended that result, it could easily have made it clear. The aggravating nature of this circumstance does not depend on the timing of the underlying offense. "The gravamen of this aggravating

factor is the silencing of potential witnesses, which could be for the underlying crime being committed or for a crime committed at another time." *State v. Moore*, 207 *N.J.Super.* 561, 569, 504 *A.*2d 804 (Law Div.1985). The fact that a murder occurs contemporaneously with the witnessed underlying crime does not mitigate the evil of killing a potential witness. "The invocation of this factor should not depend on when the other crime occurred, but rather on the evil that attends silencing a potential witness." *Id.* at 569–70, 504 *A.*2d 804.

In support of his argument, defendant quotes *State v. Monturi*, 195 *N.J.Super.* 317, 327, 478 *A.*2d 1266 (Law Div.1984), for the proposition that under c(4)(f) "the motive behind the murder must be the concealment of another prior offense, and the proofs must be limited to that issue." Defendant's interpretation notwithstanding, the court merely stated the obvious: offenses covered by c(4)(f) must occur before, not after, the murder. The court's statement was in the context of a ruling that a defendant's actions after the murder are not relevant to support the charge that he or she killed to avoid detection for the underlying crime. There is no indication that the court in *Monturi* was referring to offenses committed some time prior to the series of events leading to the murder.

Defendant also cites *People v. Brownell*, 79 *Ill.*2d 508, 38 *Ill.Dec.* 757, 404 *N.E.*2d 181, *cert. dismissed*, 449 *U.S.* 811, 101 *S.Ct.* 59, 66 *L.Ed.*2d 14 (1980), which applied that State's analogous aggravating circumstance. The Illinois Supreme Court held that that factor "does not include the investigation or prosecution for the offenses which occurred in the course of the commission of the murder offense, including the murder offense itself." 79 *Ill.*2d at 526, 38 *Ill.Dec.* at 766–67, 404 *N.E.*2d at 190–91.

Although analogous to c(4)(f) of the New Jersey Code, Illinois Revised Statutes, chapter 38, paragraph 9–1(b)7 (repealed) emphasized a witness's assistance in an ongoing investigation:

the murdered individual was a witness in a prosecution against the defendant, gave material assistance to the state in any investigation or prosecution of the defendant, or was an eye witness or possessed other material evidence against the defendant.

That emphasis suggests that the Illinois Legislature intended to exclude offenses occurring in the course of murder. The court in *Brownell* also noted that the legislative history supported that interpretation. Our legislature, however, has not expressed a similar intent.

Furthermore, our refusal to construe c(4)(f) narrowly as requested by defendant does not mean that in all felony murders that circumstance will duplicate c(4)(g). The requisite intent of c(4)(f) of avoiding detection is not involved in c(4)(g). Thus "the mere fact of a death is not enough to invoke this factor." *Riley v. State*, 366 *So.*2d 19, 22 (Fla.1979). The State must present evidence "from which the jury can infer that at least one of the purposes motivating the killing was defendant's desire to avoid subsequent detection and apprehension for his crime." *State v. Goodman*, 298 *N.C.* 1, 257 *S.E.*2d 569, 586 (1979).

We have previously held that the same evidence can support more than one aggravating circumstance. *State v. Rose, supra,* 112 *N.J.* at 526–27, 548 *A.*2d 1058; *State v. Bey II, supra,* 112 *N.J.* at 175–77, 548 *A.*2d 887. If the trial court does charge on c(4)(f) and c(4)(g), it must follow the guidelines set forth in *Bey II* and warn the jury not to double-count the evidence. *Id.* at 176, 548 *A.*2d 887.

We agree with defendant that evidence of actions taken to conceal the murder cannot be used for the purpose of proving aggravating factor c(4)(f). *State v. Monturi, supra,* 195 *N.J.Super.* at 316, 478 *A.*2d 1266 ("post-murder events and offenses have no relevance to c(4)(f)"). If a killer's attempts to conceal the murder were evidence of c(4)(f), that factor would apply to almost all murders. That type of conduct does not indicate that the murderer intended to dispose of a potential witness. Thus in this case, such facts as the defendant's

dragging the victim into the freezer and his wiping the blood off the counter cannot be used to prove the existence of c(4)(f).

## V

We affirm defendant's murder conviction, vacate the death sentence, and remand to the Law Division for a new penalty-phase trial.

Chief Justice WILENTZ joins in all except Part IV A.

Justice HANDLER has filed a separate opinion, concurring in part and dissenting in part.

HANDLER, J., concurring in part and dissenting in part.

A jury convicted defendant, Jacinto K. Hightower, for the murder of Cynthia Barlieb and for several offenses related to the murder. Following the penalty-phase trial, defendant was sentenced to death. The Court now affirms his conviction for murder and sets aside the death sentence.

I would reverse defendant's conviction as well as death sentence. I would do so because of my continuing belief that the Capital Murder Act, *N.J.S.A.* 2C:11–3, is unconstitutional as enacted, construed, and applied. I do not in this case see the necessity of repeating or expanding on the reasons that serve to explain that position. *See, e.g., State v. Di Frisco*, 118 *N.J.* 253, 284, 571 *A.*2d 914 (1990) (Handler, J., concurring and dissenting in part). I write separately, however, to explain other points of difference from the Court. These relate to the sufficiency of the homicide instructions, the admissibility of prejudicial hearsay, ineffective assistance of counsel, prosecutorial misconduct, the constitutional validity of aggravating factors c(4)(c) and c(4)(f) and their applicability in this case, and the admissibility of certain evidence proffered in the penalty phase of the trial.

## I.

I would note as plain error an issue pertaining to the sufficiency of the instructions of the homicide offenses. It is impossible to discern from this record whether defendant was convicted of purposely or knowingly causing death or of purposely or knowingly causing serious bodily injury resulting in death. In *State v. Gerald*, 113 *N.J.* 40, 91–92, 549 *A.*2d 792 (1988), this Court ruled that an identical dilemma required retrial of the guilt phase.

The indictment in this case contained, along with separate counts on felony-murder, robbery, and gun charges, two separate counts that differentiated between the culpability states of purpose and knowledge. Neither the indictment nor the final jury charge, however, required the jury to consider separately whether the homicide entailed the intent to cause death or the intent to cause serious bodily injury resulting in death. Nevertheless, the Court, relying on its decision in *State v. Pitts*, 116 *N.J.* 580, 562 *A.*2d 1320 (1989), rules that no retrial of guilt is required. *Ante* at 412–413, 577 *A.*2d at 116. It reasons that the failure to have given a proper charge conforming to *Gerald* did not constitute reversible error because there was no evidence from which a jury could possibly conclude that defendant's intention was limited to causing serious bodily injury to his victim. *Ibid.*

The State's theory was that the murder was purposeful or knowing rather than a felony murder in which death was an unintended result. Confronted with the State's rendition of the homicide, the defense was predicated on outright denial that defendant had committed the murder. Accordingly, defendant offered no evidence or argument to counter the State's assertion that the murder was purposeful or knowing. Further, consistent with the position that someone else committed the murder, defendant did not attempt to show that the murderer had intended to inflict serious bodily injury rather than death. The absence of such evidence is understandable. Prior to the

clarification and refinement of the law effectuated by *Gerald,* there was no point in presenting evidence that might differentiate between those forms of murder. Prior to *Gerald,* either form of homicide constituted capital murder.

The jury ultimately determined that the murder had been intentional, rejecting the death-ineligible option of finding defendant guilty of felony murder. I do not think, however, that the sufficiency of evidence supporting the conviction on the greater charge should determine the necessity of a *Gerald* charge. Ordinarily, the determinative consideration should be, as the Court held in *Gerald,* the *quantum* of evidence supporting the lesser, serious-bodily-injury charge. *Cf. State v. Hunt,* 115 *N.J.* 330, 374–77, 558 *A.*2d 1259 (1989) (conviction of death-eligible charge amply supported by the evidence, combined with the rejection of a death-ineligible alternative, indicated absence of prejudice where court did not instruct on other lesser charges that could have been supported by the evidence).

I believe a defendant in a capital-murder prosecution should have the benefit of the complete range of homicide offenses to be able to formulate and present defenses that can focus on the important distinctions that separate death-eligible homicides from those that are not. Consideration of due process and fundamental fairness impels no less than this. I would thus reverse the guilt conviction to allow defendant the opportunity to prepare and proffer all possible defenses and to adduce evidence, if available, that would require a full-range of homicide offenses to be presented to the jury.

## II.

During the guilt phase, Sergeant Fitz–Patrick offered testimony that constituted inadmissible hearsay. The statement, elicited by the State during direct examination, is as follows:

Q Specifically sir, I want to direct your attention to the early morning hours of August the 20th, 1985. Did you have occasion to recall those early morning hours?

A Yes, yes, I do.

Q Would you explain to the jury why that is significant to you?

A Well on August 19th, the week of August 19th, we had received information from several people in the Philadelphia area as to *who was responsible for the murder of Cynthia Barlieb* and based on that information we drove over to Philadelphia to retrieve the handgun that had been used in the murder and it was located at 668 Brooklyn Street in Philadelphia.

*At that time we were aware that Jacinto Hightower was the person responsible for the murder* and when we were going over to that area to retrieve the gun, we weren't aware that he was going to be present at the—in the vicinity of the residence.... (emphasis added)

There can be no doubt that that statement constituted inadmissible hearsay. See *State v. Bankston*, 63 *N.J.* 263, 307 *A.*2d 65 (1973). Further, and of greater import, it expressed the State's opinion that defendant was guilty of the crime charged. See *State v. Odom*, 116 *N.J.* 65, 560 *A.*2d 1198 (1989). Because that testimony related directly to the ultimate issue of guilt of capital murder, it unquestionably rises to the level of reversible error.

In *Bankston*, this Court determined to be hearsay an officer's testimony that inescapably implied that a non-testifying informant had told the officer that the defendant would have narcotics in his possession, even though the officer never specifically repeated what the informer had said. The Court was "satisfied" that such hearsay testimony "may well have been the decisive factor which resulted in the guilty verdict" and found that the error was neither harmless nor cured by a cautionary jury instruction. 63 *N.J.* at 273, 307 *A.*2d 65.

The hearsay here was infinitely worse than that in *Bankston*, which only inferentially implicated defendant's guilt. Fitz–Patrick's testimony consisted not only of inferred hearsay—relating the testimony of others—it expressed the opinion of the State that defendant was guilty of capital murder. *See State v. Odom, supra*, 116 *N.J.* 65, 560 *A.*2d 1198. The opinion of guilt expressed in the testimony was not confined to or limited by the inferred hearsay of other undisclosed persons. It constituted direct evidence of guilt: "Jacinto Hightower was the person responsible for the murder." It is simply not possible to say that that evidence, in view of its immediacy and cogency as

evidence of guilt, did not have a critical effect on the jury's deliberations and ultimate determination, even though there was extensive inculpatory evidence presented in this case.

The standard of review in a capital case does not predicate reversal on whether any error was decisive or pivotal. *See State v. Bankston, supra,* 63 *N.J.* 263, 307 *A.*2d 65. An error of this character, I submit, cannot in a capital-murder case be assimilated under a traditional assessment of its prejudice as measured against the totality of the evidence. *See State v. Bey (I),* 112 *N.J.* 45, 105–23, 548 *A.*2d 846 (1988) (Handler, J., concurring). The Court adheres to the standard, however, under which reversal is required if there exists a reasonable doubt whether the error contributed to the jury's verdict. *State v. Rose,* 112 *N.J.* 454, 523–24, 548 *A.*2d 1058 (1988). Even under that standard, the error here is reversible. A direct statement of opinion of the State that defendant is guilty of the crime of capital murder, as charged, engenders such a reasonable doubt.

Moreover, this kind of error pointedly implicates the right to a jury trial. In a capital-murder prosecution, an error of this caliber transcends the barrier created by the conventional standard of review. In no case would we ever countenance a prosecutor or a State law-enforcement witness with direct knowledge of the facts expressing a personal opinion that the defendant is guilty. We go to extraordinary lengths in ordinary criminal cases to preserve the integrity and neutrality of jury deliberations, *see, e.g., State v. Ingenito,* 87 *N.J.* 204, 432 *A.*2d 912 (1981), to avoid inadvertently encouraging a jury prematurely to think of a defendant as guilty, *e.g., State v. Simon,* 79 *N.J.* 191, 398 *A.*2d 861 (1979), to assure the complete opportunity of the jury alone to determine guilt, *e.g., State v. Collier,* 90 *N.J.* 117, 447 *A.*2d 168 (1982), to prevent the court or the State from expressing an opinion of defendant's guilt, *e.g. State v. Vick,* 117 *N.J.* 288, 566 *A.*2d 531 (1989); *State v. Odom, supra,* 116 *N.J.* 65, 560 *A.*2d 1198, and to require the jury to determine guilt under proper charges no matter how

obvious guilt may be, *e.g., State v. Vick, supra,* 117 *N.J.* 288, 566 *A.*2d 531. A failure to abide by and honor these strictures fatally weakens the role of the jury, depriving a defendant of the right to trial by jury. We should have no doubts about the integrity of the jury process and the jury's verdict, particularly a verdict of guilt on capital murder.

The Court dismisses the significance of this error, presumably, because the State's case was a "juggernaut." *Ante* at 395, 577 *A.*2d at 107. If the prosecution was a juggernaut that moved inexorably to the imposition of the death sentence, the force of its evidence did not relieve the State from giving defendant a fair trial, affording the fullest opportunity to have the jury—and the jury alone—determine guilt. I would *not* condone this kind of error in a capital-murder prosecution and would reverse on this ground. In any event, I believe this grave error, collectively with other errors, *see* discussion *infra* at 428–442, 577 *A.*2d at 123–130, would justify reversal of defendant's conviction. *See State v. Orecchio,* 16 *N.J.* 125, 106 *A.*2d 541 (1954).

## III.

This case also involves prosecutorial misconduct. The first witness to appear for the State was David Barlieb, the husband of the victim. During the testimony, the following exchange occurred between Mr. Barlieb and the prosecutor:

Q What was [Mrs. Barlieb's] birth date, do you know?

A October 30th, 1959.

Q Which would have made her at the time of her death 25, 26?

A Yeah.

This seemingly innocuous exchange took on a new dimension when the prosecutor concluded his closing argument during the guilt phase of the trial with the following remark:

Today is October 30th, 1986. Had it not been for Joey Hightower, ladies and gentlemen, Cynthia Barlieb would be twenty-seven years old today. Today is her birthday.

We have said: "[w]here ... the victim's character has no bearing on the substantive issue of guilt or the penalty to be imposed, the prosecutor may not comment on the evidence in a manner that serves only to highlight the victim's virtues in order to inflame the jury." *State v. Williams, supra,* 113 *N.J.* 393, 451–52, 550 *A.2d* 1172 (1988). Further, "[t]o justify reversal the prosecutor's comments must have been 'clear[ly] and unmistakabl[y]' improper, and the improper conduct must have resulted in substantial prejudice to the defendant's fundamental right to have the jury fairly assess the persuasiveness of his case." *Id.* at 452, 550 *A.2d* 1172 (footnote omitted); *accord State v. Koedatich,* 112 *N.J.* 225, 338, 548 *A.2d* 939 (1988); *State v. Ramseur,* 106 *N.J.* 123, 322, 524 *A.2d* 188 (1987).

The Court determines that the prosecutor's remarks during summation concerning the victim's birthday do not rise to the level of reversible error. *Ante* at 411–412, 577 *A.2d* at 115. Despite the State's contention to the contrary, the jury was not clearly and forcefully instructed that it should not consider remarks of counsel as evidence, nor was the jury explicitly instructed on the need to avoid passion or prejudice in its deliberations. Unnecessary references to the character or circumstances of a victim constitute a recurrent egregious form of prosecutorial conduct. *Booth v. Maryland,* 482 *U.S.* 496, 107 *S.Ct.* 2529, 96 *L.Ed.*2d 440 (1987); *see South Carolina v. Gathers,* —— *U.S.* ——, 109 *S.Ct.* 2207, 104 *L.Ed.* 876, *reh'g den.,* —— *U.S.* ——, 110 *S.Ct.* 24, 106 *L.Ed.*2d 636 (1989). That error occurred early in the trial, in the course of the State's case in chief, was reiterated during summation, and was reintroduced in the penalty-phase of the trial. It was calculated to influence the jury's deliberations with respect to guilt as well as to sentence. *State v. Pennington,* 119 *N.J.* 547, 599, 575 *A.2d* 816 (1990) (Handler, J., concurring in part and dissenting in part).

If the prejudicial effect of that misconduct alone, in the face of strong countervailing evidence of guilt, does not appear to require reversal, it must not be overlooked that the error

reinforces the prejudice arising from other trial errors. The prejudice from that error, in my opinion, combined with that of others, justifies a reversal of defendant's conviction.

## IV.

Defendant claims ineffective assistance of counsel during the guilt phase of the trial. He argues that the State's case was not subjected to the "adversarial testing" expected from reasonable attorney performance in that defense counsel maintained a "defeatist" attitude evidenced by the failure to cross-examine zealously certain adverse witnesses; the failure to object to improper questioning, irrelevant or prejudicial evidence, and prejudicial material in the State's closing argument; and inadequate opening and closing statements. The Court notes and rejects this claim. *Ante* at 404–412, 577 *A*.2d at 111–115.

There was no outright concession of guilt by counsel in this case. Compare *Magill v. Dugger*, 824 *F*.2d 879 (11th Cir.1987) (defense counsel conceded guilt during guilt phase of capital trial); *Francis v. Spraggins*, 720.*F*.2d 1190, 1193 (11th Cir. 1983) (defense counsel expresses belief in client's guilt during guilt-phase summation) (subsequent history omitted); *Young v. Zant*, 677 *F*.2d 792 (11th Cir.1982) (defense counsel concedes guilt at guilt phase); *Wiley v. Sowders*, 647 *F*.2d 642 (6th Cir.1981), *cert. denied*, 454 *U.S.* 1091, 102 *S.Ct.* 656, 70 *L.Ed.*2d 630 (1981). Nevertheless, it is inferable from the record that counsel believed either that his client was guilty or that the jury could reasonably so conclude. This gratuitous push towards guilt was reinforced by the impression from the record that he had distanced himself from his client, underscoring the impression that his client was guilty or was undeserving of a defense.

. That kind of conduct can be relevant in a determination of whether counsel is ineffective. In *Goodwin v. Balkcom*, 684 *F*.2d 794 (11th Cir.1982), *cert. denied*, 460 *U.S.* 1098, 103 *S.Ct.*

1798, 76 *L.Ed.*2d 364 (1983), the court noted that defense counsel highlighted to the jury their status as appointed counsel. It observed that "reminding a jury that the undertaking is not by choice, but in service to the public, effectively stacks the odds against the accused." *Id.* at 706.

The concerns in this case generated by counsel's indirect concession of defendant's guilt and his implied unwillingness to represent defendant must be considered in conjunction with other instances of ineffectiveness. In *King v. Strickland,* 714 *F.*2d 1481, 1491 (11th Cir.1983), *vacated and remanded,* 467 *U.S.* 1211, 104 *S.Ct.* 2651, 81 *L.Ed.*2d 358 (1984), *on remand,* 748 *F.*2d 1462 (11th Cir.1984) (subsequent history omitted), defense counsel told the jury during the penalty phase that he was a public defender and that he appreciated the "evil and gross[ness]" of the crime. The court found that counsel disloyalty coupled with a failure to present available character witnesses in mitigation was ineffective assistance of counsel.

Defendant alleges here that expert witnesses should have been cross-examined, particularly the fingerprint expert from the FBI and the medical examiner regarding his opinion concerning the infliction of the victim's wounds and her position relative to her assailant. Defendant also alleges that counsel had failed to develop testimony illustrating the possible bias and self-interest arising from the animosity between defendant and adverse witnesses Irene Williams and Christopher Forston. The Court, considering these contentions in isolation, is unpersuaded by them, characterizing them as discretionary trial tactics. *Ante* at 408–409, 577 *A.*2d at 113–114.

In addition, defendant points to the testimony for the State presented by Barbara Britt, defendant's landlord in Texas, and by Tina Booker, a secretary at Fort Dix who processed defendant's return from AWOL status. At trial, Ms. Britt testified that she remembered defendant particularly because he had painted his apartment orange. The trial court overruled defense counsel's objection to the question whether she had had

"any other problems" with defendant. The landlady went on to tell of rent-payment difficulties with defendant. Documents associated with that episode and bearing defendant's handwriting were entered into evidence and served as examples of defendant's handwriting for expert verification of defendant's signature on the form memorializing his purchase of the murder weapon. The testimony of Ms. Booker included additional mention of defendant's lack of cash in July 1985, and featured the submission of a note given to her by defendant that also served as a sample for handwriting analysis. Defendant argues that that testimony contained prejudicial elements that should have been excluded. The Court also discounts those contentions. *Ante* at 408–409, 577 *A.*2d at 113–114.

Concededly, *Strickland v. Washington,* 466 *U.S.* 668, 689, 104 *S.Ct.* 2052, 2065, 80 *L.Ed.*2d 657, 694 (1984), seeks to preserve "the wide latitude counsel must have in making tactical decisions. . . ." This constitutes our own prevailing standard in assessing the effectiveness of counsel, *State v. Fritz,* 105 *N.J.* 42, 519 *A.*2d 336 (1987), which we apply to capital-murder prosecutions. *State v. Davis,* 116 *N.J.* 341, 356, 561 *A.*2d 1082 (1989). Which witnesses to cross-examine and the nature of the questions asked fall within this broad zone of attorney discretion. *See United States v. Snyder,* 787 *F.*2d 1429, 1432–33 (10th Cir.), *cert. denied,* 479 *U.S.* 836, 107 *S.Ct.* 134, 93 *L.Ed.*2d 78 (1986); *Messer v. Kemp,* 760 *F.*2d 1080, 1090 (11th Cir.1985), *cert. denied,* 474 *U.S.* 1088, 106 *S.Ct.* 864, 88 *L.Ed.*2d 902 (1986); *United States v. Glick,* 710 *F.*2d 639, 644 (10th Cir.1983), *cert. denied,* 465 *U.S.* 1005, 104 *S.Ct.* 995, 79 *L.Ed.*2d 229 (1984). This case, however, does not entail only questionable tactical decisions by defense counsel. Counsel's overall handling of the defense from the standpoint of strategy was at best marginally sufficient, at worst grossly inadequate. Aside from this dimension of the attorney's role, counsel's performance was marked in its totality by an attitude and approach that undermined his client's case. There was nothing blatant or obvious about defense counsel's negative conduct

and attitude towards defendant, but in context counsel did reflect adversely on his client's cause.

The effect of defense counsel's performance was that he indirectly conceded that defendant was guilty of murder, suggested that the jury could find defendant guilty of murder, indicated that he was not representing defendant out of choice, and created the impression that defendant had no defenses or was not entitled to a defense and was unworthy of a lawyer's professional loyalty and services. In this setting, tactical defense decisions lose their independent significance. Defense counsel cannot comport himself or herself in this fashion in representing a client who is fighting for his or her life. Those circumstances demonstrate ineffective assistance of counsel, which combined with and augmented the prejudice arising from other errors occurring throughout the trial and materially contributed to defendant's conviction.

The difficult task of gauging a defendant's constitutional entitlement to effective assistance of counsel in a capital-murder prosecution, exemplified in this case, forcefully underscores the need for a more exacting and protective standard for determining the sufficiency of counsel's performance. I reiterate what I put forward in *State v. Davis, supra,* 116 *N.J.* at 413, 561 *A.*2d 1082:

> In sum, I believe the profound difference between capital and noncapital criminal prosecutions compels, as a matter of state constitutional law, the adoption of an enhanced standard by which to measure the competence of counsel and the degree of prejudice sufficient to find a violation of the right to such assistance. We must recognize that counsel representing a defendant in a capital-murder prosecution must demonstrate the competence of a specialist and expert, not simply the skills of an average practitioner. Most particularly, counsel should exhibit this level of competence in the sentencing phase of a capital murder prosecution. Further, prejudice attributable to ineffective assistance of counsel as a basis for reversal should be viewed realistically, fairly, and tolerantly. This is particularly so in the sentencing phase of the trial. Such prejudice should be presumed when counsel's inadequacy relates to the factors that a jury must consider not only in determining the existence of facts but also in weighing their comparative worth in terms of whether the defendant should live or die.

Defendant's representation in this case, coupled with other error, warrants the reversal of defendant's conviction.

## V.

Defendant argues that the form of the jury instructions was deficient for failure properly or fully to define the aggravating factors charged and, further, that aggravating factors *N.J.S.A.* 2C:11–3c(4)(c) and c(4)(f) should not have been charged.

At trial, the jury found the existence of aggravating factor c(4)(c), that "[t]he murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated assault to the victim." The trial court rejected defendant's motion for a new trial on the basis that the jury verdict and the penalty-phase determination were against the weight of the evidence.

Both defendant and the State agree that this case does not implicate the depravity element of c(4)(c). The dispute centers on whether there is sufficient evidence of defendant's *intention* to inflict the sort of extreme physical or mental suffering that indicates torture or aggravated assault.

This Court's interpretation of c(4)(c) in *Ramseur* emphasized the question of defendant's intent: "[E]xtreme physical or mental suffering must be precisely what defendant *wanted* to occur in addition to death." 106 *N.J.* at 208–09, 524 *A.*2d 188 (citations omitted). The continued emphasis on intent is evident in this Court's most recent comments concerning c(4)(c). *See, e.g., State v. Pitts, supra,* 116 *N.J.* at 635–37, 562 *A.*2d 1320; *State v. Hunt, supra,* 115 *N.J.* at 387–88, 558 *A.*2d 1259; *State v. Matulewicz,* 115 *N.J.* 191, 199–201, 557 *A.*2d 1001 (1989).

The State contends that sufficient evidence of such intent exists to place c(4)(c) before the jury. It argues that the testimony of Forston and the medical examiner supports the conclusion that the first two shots fired by defendant exemplify intentional torture or aggravated assault. The State argues that the failure to have killed the victim with the first shot

shows an intention to terrorize her, an intention further reinforced by defendant's failure to have sought to open the cash register himself until after having shot the victim a second time. The State points out that the victim remained alive until she was brought to the hospital, and that regardless of the length of time involved, her awareness of her impending death on being shot the first time elevates this murder to the realm of torture and deliberate execution.

Defendant argues that the fact that the first shot barely missed the victim's heart belies the State's contention that defendant's first two shots were intended to inflict suffering rather than to kill. Defendant goes on to argue that all three shots were intended to kill, and that defendant thought the victim was dead when he dragged her into the dairy case. Defendant further points out that there is no evidence of how long or how much the victim suffered or that defendant intended that she suffer. See *State v. Hunt, supra,* 115 *N.J.* at 413–14, 558 *A.*2d 1259 (Handler, J., concurring in part and dissenting in part).

It cannot be overemphasized that the State's argument during trial concerning defendant's intent in the shooting conflicts directly with its argument on appeal regarding defendant's intent. During guilt-phase summation, the prosecutor argued that defendant had intended to kill from the moment he entered the store; he stated explicitly that defendant's *first* shots were intended to kill or cause serious bodily injury resulting in death rather than to scare. At penalty-phase summation, the prosecutor described the *third* bullet to the head as the act raising this murder to the level of "vile and inhuman." On appeal, the State now vigorously contends that the first two shots were the manifestation of vile and inhuman aggravated assault or torture, while only the third shot was intended to kill.

The State's Janus-faced position illustrates the deficiency inherent in the aggravating factor c(4)(c), both as refined by the Court in *Ramseur* and as applied. I stressed then and renew

now my concern that the standard was intractably vague and so malleable that it was susceptible to capricious and inconsistent application. This case exemplifies that concern. A jury's determination that this homicide involved the intentional infliction of gratuitous pain can be founded only on speculation. It is simply not possible *reliably* to infer *beyond a reasonable doubt* from the evidence surrounding the homicide itself that defendant purposely tortured his victim. To allow a jury to conclude, without firmer standards, clearer instructions, and more evidence, that a defendant killed in this manner and should be put to death exceeds arbitrariness and caprice—it is pernicious.

Defendant and the State also differ over the applicability of aggravating factor c(4)(f), whether "[t]he murder was committed for the purpose of escaping detection, apprehension, trial, punishment or confinement for another offense committed by the defendant or another." In *State v. Rose, supra,* the Court held that sufficient evidence existed to support a finding of c(4)(f), that defendant shot a police officer to escape detection of possession of a gun. 112 *N.J.* at 531–32, 548 *A.*2d 1058. In *State v. Di Frisco, supra,* 118 *N.J.* 253, 571 *A.*2d 914, the Court also ruled that aggravating factor c(4)(f) could be based on evidence that the murder was committed to enable a third person to escape detection for an undisclosed antecedent crime. The Court also addressed factor c(4)(f) elliptically in *State v. Moore,* 113 *N.J.* 239, 304, 550 *A.*2d 117 (1988).

In *State v. Monturi,* 195 *N.J.Super.* 317, 478 *A.*2d 1266 (Law Div.1984), the court held that evidence of post-murder events or offenses could not prove whether murder had been committed to avoid detection for a prior offense. *Id.* at 326–27, 478 *A.*2d 1266. In *State v. Moore,* 207 *N.J.Super.* 561, 504 *A.*2d 804 (Law Div.1985), the court discussed c(4)(f) and concluded that a murder executed in conjunction with or as part of a felony could satisfy that aggravating factor if there is "evidence from which the jury could infer that at least one reason for the

killing was to prevent the victim from informing the police and testifying against the defendants." *Id.* at 569–70, 504 *A.*2d 804.

I strongly believe that the *Monturi* approach, that "prior" offenses do not include contemporaneous ones, is correct. Without this differentiation, *any* felony murder becomes a c(4)(f) situation because there will rarely be a case in which it cannot be readily inferred that the murder accompanying the underlying felony was accomplished for the purpose of escaping detection for the underlying felony. *See, e.g., People v. Brownell,* 79 *Ill.*2d 508, 38 *Ill.Dec.* 757, 404 *N.E.*2d 181 (1980) (subsequent history omitted); *State v. Goodman,* 298 *N.C.* 1, 257 *S.E.*2d 569 (1979).

Moreover, as the majority acknowledges, evidence of actions taken to conceal a murder cannot be used for the purpose of proving aggravating factor c(4)(f), escaping detection. *State v. Monturi, supra,* 195 *N.J.Super.* at 326, 478 *A.*2d 1266 (post-murder events and offenses have little or no relevance to c(4)(f)). The majority correctly observes:

If a killer's attempts to conceal a murder were evidence of c(4)(f), that factor would apply to almost all murders. That type of conduct does not indicate that the murderer intended to dispose of a potential witness. Thus in this case, such facts as the defendant's dragging the victim into the freezer and his wiping the blood off the counter tend to prove that he attempted to conceal the murder, not the felony, and thus cannot be used to prove the existence of c(4)(f).

[*Ante* at 422–423, 577 *A.*2d at 120–121.]

It must follow that in any felony murder case in which the killer attempts to conceal the murder, it will not be possible to separate or distinguish his intent to conceal the murder from his intent to conceal the felony. If in the former context such an attempt at concealment is overly broad because it would apply c(4)(f) to "almost all murders," it is surely overinclusive in its potential application to murders committed in the course of felonies.

Unless the standard governing the admissibility and use of evidence to prove c(4)(f) is clarified and limited to mean only a prior offense unrelated to the murder itself, it fails to restrict properly the number of defendants who will be exposed to the

death penalty under a charge involving felony murder. Inevitably this will engender an intolerable level of inconsistency and randomness. In this case, I would hold the standard unconstitutional as applied and reverse the death sentence on that ground.

## VI.

This case also raises significant issues concerning evidence that a defendant may offer in the penalty-phase trial. At the beginning of the penalty phase, defendant sought to have his attorney barred from presenting evidence in mitigation. The Appellate Division found that defendant could not do so, *State v. Hightower*, 214 *N.J.Super.* 43, 518 *A*.2d 482 (App.Div.1986). The trial court nevertheless allowed defendant to request the death penalty through the exercise of allocution.

Defendant now argues that allowing him to request death in this manner constituted reversible error. I agree. This Court has embraced the policy concerns of accuracy, reliability, and proportionality in sentencing that enjoin defendant from preventing the presentation of mitigating evidence. *State v. Zola*, 112 *N.J.* 384, 428–32, 548 *A*.2d 1022 (1988); *State v. Koedatich*, *supra*, 112 *N.J.* at 327–32, 548 *A*.2d 939. Allowing defendant to face the jury and request death undermines those principles.

In defining the boundaries of permissible statements in allocution, this Court carefully distinguished between defendant's right to express the wish that his life be spared and an effort by defendant to confuse the situation by making assertions of fact that properly should be subject to cross-examination. In *Zola*, this Court expressed its belief that "[i]n the face of the State's forceful pleas in favor of the death penalty, it is difficult to accept the argument that the briefest statement by the defendant would inject a fatal emotionalism into the jury's deliberations." 112 *N.J.* at 431, 548 *A*.2d 1022. This could be interpreted as expressing confidence in the jury's capacity to understand and assimilate defendant's statements. The discus-

sion of allocution in *Zola*, however, was clearly limited to defendant's exercise of allocution as a plea for mercy. This simply confirms the ultimate standard of decency and fairness that a civilized society strives to follow in meting out the death sentence. It reflects our allocution Rule for non-capital cases, *R.* 3:21-4(b), which states that defendants shall be asked prior to sentencing if they wish to make a statement in their "own behalf *and* to present any information in mitigation of punishment" (emphasis added).

We are committed to allowing only the jury, exercising the conscience of the community, to determine whether defendant deserves to die. That commitment underlay our decisions in *State v. Koedatich (I)*, 98 *N.J.* 553, 489 *A.*2d 659 (1984), denying a capital murder defendant's motion to dismiss the appeal of his conviction and sentence, and in *Koedatich (II)*, *supra*, 112 *N.J.* at 332, 548 *A.*2d 939, in which we held that the failure to present mitigating evidence at the penalty phase of a capital-murder trial constituted reversible error. The determination of a life or death sentence in a capital case is an extraordinarily delicate and sensitive judgment. We have been mindful that the jury's judgment whether to impose the death penalty must be carefully guided and clearly circumscribed. While normative in effect and reflective of societal values, such a judgment should, to the extent possible, be reasoned, objective, and principled. It is simply intolerable to permit a jury that is poised to determine whether defendant should live or die to be jostled by the defendant's personal belief that he or she should be put to death. We cannot, on the one hand, insist on structured death-penalty decisions and, on the other, allow a defendant's desire to die, for whatever reason, destroy that structure. Allowing a defendant to ask to be put to death can taint the integrity of the jury's decision to execute the defendant, and we can never, in such a case, know whether such a death wish in fact is the critical factor that tips the balance in favor of death. Stated differently, if the jury would not have

voted to execute the defendant in the absence of defendant's death wish, a death sentence should not be imposed.

In my view, the Court in *Zola* correctly extended to capital-murder defendants the right of allocution only to enter a personal plea for mercy. The notion of "mercy" is based on a perception that does not encompass logical relevance to the jury's penalty decision. Mercy is engrained in a civilized system of criminal justice. It does not follow that because a plea for "mercy" is allowed in capital sentencing determination, a death wish should also be allowed.

Moreover, it is simply not possible to place credence and reliability in such a death wish. The psychological reasons behind such a feeling are often unfathomable, and, more convincing, the unreliability of such a death-wish is exemplified by the fact that defendants often change their minds, *e.g.*, *State v. Koedatich*, *supra*. In fact, in this case defendant has changed his mind. Any other dignitary interest that encompasses the right to choose an alternative definition of "mercy" that is at the heart of allocution does not overcome the constitutional mandate that the death penalty be meted out with consistency and uniformity as the ultimate reflection of the judgment of society expressed through the jury verdict.

During the penalty phase, defendant also sought to subpoena a member of the State Parole Board to testify about parole criteria. Defendant intended to tie that testimony to statistical evidence concerning prospects for rehabilitation, future release, and recidivism. The trial court disallowed that testimony as too speculative given the possible changes in parole criteria and also as too distant from the issue of defendant's character. The trial court also disallowed statistical evidence concerning the non-deterrent effect of the death penalty and arbitrary imposition of the death penalty on minorities. Defendant claims those rulings were error. The Court rejects those contentions. *Ante* at 416–417, 577 *A*.2d at 117–118.

State v. Davis, 96 N.J. 611, 477 A.2d 308 (1984) (per curiam), articulates the principle of broad admissibility of mitigating evidence during the penalty phase. An underlying requirement is that "the proffered evidence ... must be relevant to one or more of ... three categories, i.e., defendant's character or record, or the circumstances of the offense." State v. Gerald, supra, 113 N.J. at 103, 549 A.2d 792; see Woodson v. North Carolina, 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944, 961 (1976). That limitation echoes the language of N.J. S.A. 2C:11–3c(5)(h), the catch-all mitigating factor, and provides definition to this Court's admonition concerning the inadmissibility of testimony that diverts "the jurors' attention from the facts of the case before them." Ramseur, supra, 106 N.J. at 322, 524 A.2d 188.

Sentencing in non-capital cases is informed by a plethora of information that can include considerations governing parole. See, e.g., State v. Lark, 117 N.J. 331, 567 A.2d 197 (1989); State v. Howard, 110 N.J. 113, 539 A.2d 1203 (1988); Parole Bd. v. Byrne, 93 N.J. 192, 460 A.2d 103 (1983); In re Parole Application of Trantino, 89 N.J. 347, 446 A.2d 104 (1982). There is no principled reason why such information should be removed from the sentencing determination in a capital case. In determining mitigating factors the sentencer, whether jury or judge, should be able to know and consider what kind of rules will serve to measure the "rehabilitation" of an offender when he or she is eligible for parole and to assess the likelihood that such a defendant will be released. Such information is surely as germane and probative as statistical evidence bearing on the future conduct of defendant. See State v. Davis, supra, 96 N.J. at 617, 477 A.2d 308.

Some jurisdictions deem testimony concerning parole or commutation as inappropriate. Although introduction of such information may not compromise a defendant's constitutional rights, California v. Ramos, 463 U.S. 992, 1014, 103 S.Ct. 3446, 3460, 77 L.Ed.2d 1171, 1179 (1983), many courts exclude such testimony because it introduces an element of speculation about

the future action of individuals other than defendant, resulting in the "interjection of an unquantifiable factor into the deliberation process, thereby rendering the decision arbitrary," *People v. Ramos*, 37 *Cal.*3d 136, 152, 689 *P.*2d 430, 439–40, 207 *Cal.Rptr.* 800, 809 (Cal.1984). *See Quick v. State*, 256 *Ga.* 780, 786, 353 *S.E.*2d 497, 503 (1987). Indeed, New Jersey case law prior to *N.J.S.A.* 2C:11–3 adhered to that view. *State v. White*, 27 *N.J.* 158, 177, 142 *A.*2d 65 (1958). Nevertheless, in *State v. Davis, supra*, 96 *N.J.* 611, 477 *A.*2d 308, and *State v. Zola, supra*, 112 *N.J.* 384, 548 *A.*2d 1022, our Court had clearly taken a different direction—from which it now departs. I would follow the path of *Davis* and *Zola* and find that evidence admissible.

## VII.

For these several reasons, I would reverse defendant's conviction of guilt of capital murder and his death sentence. I accordingly concur in part with and dissent in part from the Court's judgment.

Chief Justice WILENTZ joins in that portion of Point VI which would bar a defendant from seeking a death penalty.

*For affirmance; vacated and reversal*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HEARN, GARIBALDI and STEIN—7.

*Opposed*—None.